NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11869
SJC-11870

COMMONWEALTH  vs.  CHARLES MENDEZ
(and eleven companion cases[1]).

Bristol.     October 11, 2016. - February 22, 2017.

Present:  Gants, C.J., Hines, Gaziano, Lowy, & Budd, JJ.

Homicide.  Firearms.  Robbery.  Assault and Battery by Means of a Dangerous Weapon.  Felony-Murder Rule.  Constitutional Law, Search and seizure, Reasonable suspicion.  Search and Seizure, Reasonable suspicion.  Practice, Criminal, Capital case, Motion to suppress, Trial of indictments together, Argument by prosecutor, Instructions to jury.  Witness, Credibility.  Jury and Jurors.

Indictments found and returned in the Superior Court Department on January 7, 2011, and February 11, 2011.

Pretrial motions to suppress were heard by Renee P. Dupuis, J., and a motion for joinder was also heard by her; and the cases were tried before D. Lloyd Macdonald, J.

Cathryn A. Neaves for Charles Mendez.
Jennifer H. O'Brien for Tacuma Massie.
Yul-mi Cho, Assistant District Attorney, for the Commonwealth.

---

[1] Five against Charles Mendez and six against Tacuma Massie.

BUDD, J.  On the evening of November 18, 2010, Edward Platts was shot and killed while sitting in his motor vehicle at a housing complex in Fall River.  The defendants, Charles Mendez and Tacuma Massie, were each indicted on charges of (1) murder in the first degree[2]; (2) carrying a firearm without a license; (3) carrying a loaded firearm without a license; and (4) armed robbery.  They additionally were charged with assault and battery by means of a dangerous weapon and armed robbery on separate indictments in connection with a separate incident involving a different individual.  The motion judge denied the defendants' motions to suppress evidence seized in connection with their warrantless stop.  At the conclusion of a joint jury trial in September, 2013, the defendants were convicted of all charges.

Each defendant filed a timely notice of appeal.  Both assert the following errors:  the denial of his motion to suppress; the joinder at trial of the indictments for two separate incidents; and portions of the prosecutor's closing argument.  Massie further argues that there was insufficient evidence to convict him of the armed robbery and felony-murder.  Each defendant separately asserts additional errors pursuant to Commonwealth v. Moffett, 383 Mass. 201, 208 (1981).

_____

[2] Both defendants were charged on a theory of felony-murder; Mendez was also charged on a theory of deliberate premeditation.

We affirm the defendants' convictions and decline to exercise our extraordinary power under G. L. c. 278, § 33E.

1. Background. We summarize the facts in the light most favorable to the Commonwealth, reserving certain details for discussion of specific issues.

On the evening of November 18, 2010, just after 6 P.M., the defendants ambushed and robbed Ryan Moitoso in a parking lot. Moitoso thought he was meeting Mendez's girl friend to sell her marijuana. The girl friend drove the defendants near the area where she was to meet Moitoso and let them out of her vehicle. As Moitoso spoke with the girl friend, the defendants approached him from behind. One of them hit him in the head with a hard metal object and told him to empty his pockets. Moitoso turned over some cash and marijuana, and heard a clicking noise that sounded like a gun being cocked, before being allowed to return to his vehicle. The defendants got back into the girl friend's vehicle, and she drove away. When she asked what had happened, one of the defendants replied, "That's life," and tossed a bag of marijuana into the front passenger area.

Next, the girl friend dropped the defendants off at a nearby housing complex where Massie had arranged to meet Platts (victim) on the pretext of wanting to make a marijuana purchase. The defendants intended to rob the victim of the approximately $4,000 that, Massie had learned, he was carrying that day.

Prior to the meeting, a witness was parked in the housing complex and, while sitting in his vehicle, observed two men fitting the description of the defendants walk by him. The victim, who had a puppy with him, parked his vehicle behind the witness's vehicle. The witness then observed the same two men walk toward the back of his vehicle. Within seconds, the witness heard a gunshot and a vehicle engine accelerate, and then he felt the victim's vehicle hit the back of his vehicle. The witness telephoned 911 and told the dispatcher that a man had been shot. A resident of the complex looked out of her window at the sound of the gun shot to observe an individual matching Mendez's description get out of the passenger side of the victim's vehicle and quickly leave the scene carrying something clutched to his chest.

In the meantime, Mendez's girl friend received several telephone calls from Massie between 6:41 and 6:49 P.M. She returned to the complex and picked up both Massie and Mendez, pulling away quickly from the curb where they entered her vehicle. A State trooper who was in the housing complex investigating the 911 call observed the vehicle's hasty departure, and followed it. See part 2.a, infra.

When the defendants were arrested, both were carrying handguns; Massie's was loaded. Massie had more than $4,000 in cash, Mendez's clothes were stained with the victim's blood, and

police found the victim's puppy in the vehicle. Police found Mendez's hat in the victim's vehicle.

The victim was shot at close range behind his right ear as he sat in his vehicle. At trial, Mendez claimed that the victim had drawn a gun on him and, after a struggle, he shot the victim in self-defense. He also claimed that the handgun that he had had in his possession when he was apprehended belonged to the victim.

2. Discussion. a. Motion to suppress. The defendants claim error in the denial of their motions to suppress evidence seized as a result of a warrantless stop that took place soon after the shooting. The constitutionality of the stop depends on the police officer having reasonable suspicion of criminal activity at the time it occurred. Commonwealth v. DePeiza, 449 Mass. 367, 371 (2007). Reasonable suspicion "must be grounded in 'specific, articulable facts and reasonable inferences [drawn] therefrom' rather than on a 'hunch.'" Id., quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004).

When reviewing a ruling on a motion to suppress, "we accept the [motion] judge's subsidiary findings of fact absent clear error and leave to [that] judge the responsibility of determining the weight and credibility to be given oral testimony presented at the motion hearing." Commonwealth v. Wilson, 441 Mass. 390, 393 (2004). However, "[w]e review

independently the application of constitutional principles to the facts found."  Id.

 We summarize the facts found by the motion judge.  After the witness's vehicle was hit by the victim's, the witness telephoned 911 to report that a person had been shot in the head in his vehicle and was dead, and that the individuals involved had fled.[3]  A State police trooper with the violent fugitive apprehension section, who was dressed in plain clothes and traveling nearby in an unmarked police cruiser, heard the police transmission of this report and headed toward the housing development.  Approximately two blocks from the development he observed a person moving quickly toward a parked vehicle. Without stopping, the trooper relayed the registration plate number and learned that the vehicle was registered to a woman with no criminal history.  Moments later, and less than ten minutes after the initial 911 transmission, he arrived at the complex and began to patrol, looking for suspicious activity.

 As the trooper drove through the housing complex, which he found to be unusually quiet, he observed an individual, later identified as Mendez, make a "beeline" to a white Honda Civic automobile that was stopped at the curb with its engine running. Mendez entered at the rear passenger side of the vehicle, which

---

 [3] The witness told the 911 operator that the perpetrator or perpetrators fled in another motor vehicle.  In fact, the defendants initially fled on foot.

started to pull away quickly, before Mendez had fully entered or closed the door. Because of what appeared to the trooper to be a very unusual absence of any other people and lack of any other activity on the streets or sidewalks in the housing complex, and the vehicle's quick departure from the area, the trooper followed the vehicle while it traveled in a "serpentine route," meandering through the city streets.[4] Meanwhile, police who had responded to the scene at the housing complex confirmed to the trooper that a man had been shot in the head and killed.

While following the vehicle, the trooper reported its registration plate number and learned that an individual associated with the address of the vehicle's owner had "lots of violence" on his record, including a firearms charge, and

---

[4] Mendez claims that it was error for the motion judge to find that there were no other suspect vehicles in the area when the trooper saw the white Civic because the trooper earlier had observed and relayed the registration plate number of another vehicle that was located two blocks away from the complex and had its motor running. There was no error. The motion judge made clear in her findings that, aside from the first vehicle, which the trooper had eliminated from suspicion before he even saw Mendez, the trooper "did not observe a pedestrian, a car containing people, a running motor vehicle or any other normal activity for that time of day in such a large housing complex." Additionally, Mendez points to no testimony that indicates this vehicle's motor was running. Mendez further contends that there was no basis for the judge's finding that residents of the housing development stayed inside after the shooting because they were afraid of being shot. This finding, even if conclusory, is a reasonable inference given the uncontested fact that, according to the trooper and credited by the judge, there was no activity to speak of in the area at the time the white vehicle made its hasty exit.

pending drug charges. The trooper, who could see that there were two persons seated in the back of the vehicle, radioed for backup. Approximately four miles away from the housing complex, the driver of the vehicle stopped in front of a three-family home but kept the motor running. As the trooper was without backup or a place to park, he stopped his vehicle in the middle of the street and waited. Approximately fifteen to thirty seconds later, the two defendants got out of the back seat of the vehicle at the same time and turned to face him. They were speaking to one another and both had their hands in their jacket pockets. In fear of his safety, the trooper got out of his vehicle, showed his badge and said, "Police, don't move." The two men fled in opposite directions. Mendez ran toward the trooper but soon returned to the white vehicle, getting in and telling the driver to "take off." The trooper drew his weapon and ordered the driver, later identified as Mendez's girl friend, to shut off the motor; she did so. Once another officer arrived, police recovered a handgun that was tucked into Mendez's waistband.

In the meantime, a third officer saw Massie, who was less than one block away from the white vehicle and running with one hand in his pocket. The officer chased him and ordered him to stop. Massie did not comply, but he was apprehended; he was carrying a loaded semiautomatic pistol and cash.

All parties agree that both defendants were seized in a constitutional sense when the trooper announced that he was a police officer and ordered the men not to move. On appeal, the defendants argue that the trooper stopped them on a hunch rather than reasonable articulable suspicion of criminal activity. They claim that the information available to the trooper should not have caused him to follow them; that that they could just as easily have been on a "leisurely" drive through the city, without any particular place to be; and that when the vehicle finally stopped, all the trooper observed was two men getting out and looking into the headlights of a vehicle parked behind them in the street, with their hands in their pockets due to the cold weather.

Given that "[s]eemingly innocent activities taken together can give rise to reasonable suspicion," Commonwealth v. Watson, 430 Mass. 725, 729 (2000), and that "[t]he gravity of the crime and the present danger of the circumstances may be considered in the reasonable suspicion analysis," Commonwealth v. Depina, 456 Mass. 238, 247 (2010), the trooper clearly had reasonable suspicion for the stop. See Commonwealth v. Meneus, 476 Mass. 231, 239 (2017) (violent nature of crime relevant when coupled with "totality of the information known to police, including the defendant's geographical and temporal proximity to the scene of

the crime and his suspicious behavior in the wake of the shooting").

Police received a 911 call from a witness who identified himself and who relayed firsthand knowledge of what he believed to be a fatal shooting in a housing complex. See Commonwealth v. Stoute, 422 Mass. 782, 790-791 (1996). In less than ten minutes, the trooper was driving through the housing complex, having already eliminated a suspect but on the lookout for others.[5] See Depina, 456 Mass. at 246. Mendez's rush to enter the motor vehicle and its subsequent hasty exit comprised the only activity that the trooper observed in the housing complex.[6] See Commonwealth v. Quinn, 68 Mass. App. Ct. 476, 480 (2007).

_____

[5] Massie places much weight on the fact that the witness's report of two people fleeing in a vehicle immediately after he heard the gunshot was at odds with the trooper's observation (and suspicion) of a vehicle pulling quickly away almost ten minutes later. As it turned out, the defendants initially fled on foot. That the witness did not get the description exactly right about what happened in the immediate aftermath of the shooting does not mean that the trooper was obliged to ignore his own observations. See Commonwealth v. Mercado, 422 Mass. 367, 368, 369-371 (1996) (finding officer's suspicion reasonable despite conflicting descriptions of shooting suspects).

[6] Massie's reliance on Commonwealth v. Warren, 475 Mass. 530 (2016), is misplaced. There we held that it was unreasonable to stop pedestrians twenty-five minutes after, and one mile away from, a breaking and entering where they did not match the description provided to police. Id. at 535-536. Here, the white vehicle was temporally and geographically closer to the crime and there was no description of the suspects. Compare Commonwealth v. Depina, 456 Mass. 238, 246-247 (2010) (reasonable to stop person matching vague description of shooter when found approximately ten minutes after gunfire and three blocks away).

He did not need reasonable suspicion to follow the motor vehicle. See Commonwealth v. Williams, 422 Mass. 111, 116 (1996) ("No degree of suspicion, reasonable or otherwise, was constitutionally required for the police to commence surveillance" by following suspect vehicle).

As the trooper trailed the defendants for eight and one-half minutes and approximately four miles, he learned additional information that contributed to his suspicion. See Commonwealth v. Wren, 391 Mass. 705, 707 (1984) ("[a] hunch will not suffice"). The vehicle he was following had returned to a normal speed but was traveling in a "serpentine route" through the city, without an apparent destination. See Watson, 430 Mass. at 730. When he relayed the vehicle's license plate, he learned that it was associated with a person whose criminal record reflected assault and battery and firearms charges.[7] See Commonwealth v. Wright, 85 Mass. App. Ct. 380, 383 (2014). Finally, police who had responded to the scene at the housing

_____

[7] The defendants argue that it was error to find that the criminal record could influence the trooper's calculus because all of the individual's violence-related charges had been dismissed, including the firearms charge. There was no error; police knowledge that a criminal history includes weapons-related charges can add to reasonable suspicion. See Commonwealth v. Gomes, 453 Mass. 506, 512-513 (2009). See also Commonwealth v. Dasilva, 66 Mass. App. Ct. 556, 561 (2005) ("police knowledge of a person's arrest record or unspecified 'criminal record' [can] be considered in a reasonable suspicion evaluation").

complex confirmed to the trooper that a person had been fatally shot in the head.  See Mercado, 422 Mass. at 368-370.

By the time Massie and Mendez, who had simultaneously gotten out of their vehicle, stood face-to-face and staring at the trooper with their hands in their pockets, the fear that the two had participated in the killing and presented a possible threat to his safety and that of the public was eminently reasonable.  See Scott, 440 Mass. at 648, citing Terry v. Ohio, 392 U.S. 1, 21 (1968) (court analyzes justification for stop at time it occurs).[8]

b.  Joinder of charges.  The defendants challenge the motion judge's decision to join for trial the charges related to the robbery of Moitoso with those related to the robbery and shooting of Platts, arguing that it amounted to an unfairly prejudicial admission of propensity evidence.  We review the motion judge's decision for an abuse of discretion.  See Commonwealth v. Gray, 465 Mass. 330, 335, cert. denied, 134 S. Ct. 628 (2013).

---

[8] Massie argues that his subsequent stop was unreasonable because the officer who apprehended him had no reasonable suspicion to do so as all he observed was Massie running with his hand in his front right pocket.  This argument has no merit; he had already been stopped by the trooper.  In any case, the trooper's knowledge that Massie was a suspect in a shooting is imputed to the other officer.  See Commonwealth v. Quinn, 68 Mass. App. Ct. 476, 480-481 (2007).  The subsequent frisk was likewise justified.  See Commonwealth v. Vasquez, 426 Mass. 99, 102-103 (1997).

Upon motion, joinder is appropriate where offenses are related unless such joinder "is not in the best interests of justice." Mass. R. Crim. P. 9 (a) (3), 378 Mass. 859 (1978). Offenses are related for the purposes of joinder "if they are based on the same criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan" (citation omitted). Commonwealth v. Hernandez, 473 Mass. 379, 393 (2015). Factors to take into consideration include "factual similarities, closeness of time and space, and 'whether evidence of the other offenses would be admissible in separate trials on each offense'" (citation omitted). Id.

Here there was considerable evidence demonstrating that the two incidents were related. In each case, a jury could have found that the defendants set up meetings with the victims under the pretense of buying marijuana and instead robbed them using a gun (even though the second robbery ended with the victim being killed). In addition, the events took place within less than one hour of each other and within a ten-minute drive of each other. See Hernandez, 473 Mass. at 393 (separate robberies occurring within time span of five hours and sharing common method of coercion were related for purposes of joinder).

Further, evidence of each robbery would be admissible in the trial of the other if the trials were separated. Although evidence of one crime is inadmissible to show a propensity to

commit other such crimes, prior bad act evidence may be admissible if relevant for another purpose such as motive, state of mind, or a common scheme or pattern. Commonwealth v. Walker, 442 Mass. 185, 202 (2004). Evidence of the robbery of the victim is certainly reflective of a common scheme or pattern in a trial of the robbery of Moitoso, and vice versa.

Nor have the defendants shown that they were unfairly prejudiced by the joinder. See Commonwealth v. Sullivan, 436 Mass. 799, 805 (2002). The judge asked the venire during voir dire to comply with an instruction that evidence of each robbery be considered independently, and that the evidence of one not be taken as proof of propensity to commit the other. During his instructions to the jury prior to deliberations, the judge explained that evidence of the two incidents was not to be used to prove that the defendants had a propensity to commit the crimes of armed robbery or murder and that they were to consider each episode separately. "The jury are presumed to follow the judge's instructions." Commonwealth v. Andrade, 468 Mass. 543, 549 (2014).

The motion judge did not abuse her discretion in joining the indictments for trial.

c. Closing argument. The defendants point to two aspects of the prosecutor's closing argument as error.

i.  Comments on Mendez's testimony.  Both defendants argue that the prosecutor made improper comments in his closing regarding Mendez's testimony.[9]  During direct examination, Mendez admitted to assaulting and robbing Moitoso.  He testified that the plan then was to meet the victim at the housing development and purchase approximately twelve pounds of marijuana from him.  Mendez further testified that while he was in the victim's vehicle the two men had a disagreement, the victim pulled out a gun, and, in a struggle for the gun, Mendez shot the victim in self-defense.  He went on to say that after the shooting, he got out of the vehicle with the gun, then returned for his hat (which had fallen off) but instead grabbed the puppy.  He then met up with Massie, who had been waiting with the over $4,000 in cash they had saved to buy the marijuana.

On cross-examination, Mendez testified that his initial account to police after his arrest was not consistent with his trial testimony because he had lied to the investigators on the night of the victim's death.  Among other things, he told police that because of his drug use, he was unable to recall the events of the evening, and specifically did not remember going to a housing complex, carrying a gun, or being involved in a shooting.

_____

[9] Massie did not testify, but his counsel endorsed Mendez's testimony in closing argument.

In his closing argument, the prosecutor suggested that Mendez conformed his testimony to the Commonwealth's evidence:

> "[W]hen you talk about the night when he got caught with the gun on him, there's a puppy, and he's brought down to the station, oh, I lied about everything.  Of course he lied about everything because he didn't know what we knew, the police.  And of course, then as the evidence is developed, he now fits it all in a nice little package for you. . . .  Evidence is what is said, not then what you want to try to shape it at the end."  (Emphases added.)

The defendants claim that the prosecutor's statements improperly commented on Mendez's right to confront witnesses by being present in the court room during the trial.  Because neither defendant objected to the closing argument, we review to determine if there was error or misconduct, and if so, whether it created a substantial likelihood of a miscarriage of justice.  Commonwealth v. Taylor, 455 Mass. 372, 377 (2009).

In arguing error, the defendants point to Commonwealth v. Person, 400 Mass. 136 (1987), and Commonwealth v. Alphonse, 87 Mass. App. Ct. 336 (2015), where convictions were overturned because, in each case, the prosecutor improperly argued that the defendant tailored his testimony to match the evidence presented.  These cases are distinguishable.

"[A] prosecutor may, if there is a basis in the evidence introduced at trial, attack the credibility of a defendant on the ground that his testimony has been shaped or changed in response to listening to the testimony of other witnesses."

Commonwealth v. Gaudette, 441 Mass. 762, 767 (2004). See Commonwealth v. Sherick, 401 Mass. 302, 305 (1987). Here, where the defendant made pretrial statements to police that were different from his trial testimony, the prosecutor had a basis in the evidence for pointing out that his trial testimony did not match his prior statements to police, and instead conformed to the Commonwealth's evidence. By contrast, in Person, 400 Mass. at 137, 138, 142, the defendant made no pretrial statements; thus, while the prosecutor intimated that he had fabricated his testimony, there was no evidence presented at trial to support this argument. Accord Alphonse, 87 Mass. App. Ct. at 336, 339 (no evidence to support prosecutor's assertion that defendant had tailored his version of events to testimony of other witness). Given Mendez's pretrial statements in this case, the prosecutor fairly commented on "the quality of the evidentiary picture the defendant was trying to paint." Commonwealth v. Moore, 408 Mass. 117, 132 (1990). There was no error.

ii. Arguing facts not in evidence. Massie asserts that there was no adequate basis in evidence for the prosecutor to argue in his closing that Massie had been in the back seat of

the victim's vehicle, or that Mendez had shot the victim because
he wanted the puppy.[10]

"[A] prosecutor may analyze the evidence and suggest
reasonable inferences the jury should draw from that evidence."
Commonwealth v. Semedo, 456 Mass. 1, 13 (2010).  Here, there was
evidence from which the jury could infer that Massie had been
seated in the back seat of the victim's vehicle just before the
shooting, including the fact that Massie set the meeting up via
several telephone calls to the victim, and the witness
testified that he saw both men walk toward the victim's vehicle
just before the gun was fired.  To be sure, there was evidence
tending to prove that Massie was not in the vehicle at the exact
time of the shooting (e.g., the fact that there was no blood on
his clothing, and only Mendez was seen exiting the vehicle after
the shot had been fired).  However, contrary to Massie's claim,
this evidence supports, rather than negates, the prosecutor's
version of events, i.e., that Massie left the vehicle with the
cash prior to the shooting.

There was also evidence from which the jury could infer
that Mendez shot the victim because of the puppy.  There was
evidence that Massie had left the vehicle with the cash the

---

[10] The prosecutor stated:  "Massie now has got the money,
he's out of the car [running].  [Mendez] . . . now wants the
dog.  And a tussle, struggle, whatever, you're not getting the
dog.  Bang, he's shot in the head.  What does he do, and why is
that, as you know why, the purpose was what he wanted."

defendants had planned to steal, and it is a fair inference that there would have been little, if anything, left to argue about. The fact that Mendez shot the victim and then took the puppy provided further evidence from which the jury could infer that Mendez shot the victim because he wanted the puppy.[11]  There was no error.

d.  <u>Insufficient evidence</u>.  Massie argues that the evidence in support of his convictions of the armed robbery and felony-murder of the victim was impermissibly thin.  He claims that the $4,120 in cash he was carrying at the time of his arrest could not have come from the victim because it was not folded and sectioned as described by a witness who testified to seeing the victim with the cash earlier in the day.  This, he asserts, plus the fact that other items in the vehicle were not taken ($124 in cash found in the victim's pocket and several small bags of marijuana), proves the defendants did not rob, or intend to murder, the victim.  To succeed in a claim for insufficient evidence, Massie must show that, in viewing the evidence in the light most favorable to the Commonwealth, no rational trier of fact could have found the essential elements of the crimes

---

[11] The prosecutor offered a hypothetical scenario complete with a hypothetical statement made by the victim before he was shot.  The trial judge appropriately reminded the jury that closing arguments are not evidence, and instructed them to ignore the suggestion that the victim had told Mendez, "You're not getting the dog."

beyond a reasonable doubt.  See Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979).  This he is unable to do.

Evidence of the armed robbery of the victim viewed in the light most favorable to the Commonwealth included the following.[12]  Massie and Mendez earlier robbed Moitoso with a gun.  Thereafter, Massie arranged to meet the victim at the housing complex.  He knew that the victim had a large sum of cash with him through conversations the two had earlier in the day.  Massie was seen walking toward the victim's vehicle and was carrying a gun.

That there was an inconsistency between a witness's observation and the actual organization of the cash when it was recovered from Massie[13] does not prove that the victim was not robbed.  "If the evidence lends itself to several conflicting interpretations, it is the province of the jury to resolve the discrepancy and determine where the truth lies" (quotation and citation omitted).  Platt, 440 Mass. at 401.  Here there was more than enough circumstantial evidence for the jury to

---

[12] To make a case for felony-murder, the Commonwealth must only establish that Massie participated as a joint venturer in an armed robbery of the victim, and that the victim was killed in furtherance of that robbery.  See, e.g., Commonwealth v. Kilburn, 426 Mass. 31, 34-37 (1997).

[13] A witness testified that she had seen victim with his money wrapped in blue and manila rubber bands earlier in the day.  The cash recovered from Massie was folded and wrapped in a single red rubber band.

conclude that both defendants committed armed robbery against the victim. They could have concluded that the victim reorganized the cash prior to meeting with the defendants or that the witness who saw the cash was mistaken. The jury also could have concluded that departing quickly with the large amount of cash was more important than grabbing the small bags of marijuana and checking the victim's pockets for additional money.

"Whether an inference is warranted or is impermissibly remote must be determined, not by hard and fast rules of law, but by experience and common sense" (citation omitted). Commonwealth v. Giang, 402 Mass. 604, 609 (1988). Thus, although the jury were free to adopt the defendants' version of events, they were also free to reach a different rational result. Platt, 440 Mass. at 401.

e. Moffett claims. Each defendant raises separate arguments pursuant to Moffett, 383 Mass. at 208. First, Mendez complains that his due process rights were violated when a witness to the Moitoso robbery was allowed to testify because he was not credible. The credibility of witnesses is for the jury to decide. Commonwealth v. Watkins, 473 Mass. 222, 229 (2015). The defendants had the opportunity to explore the issue of the witness's credibility during cross-examination, and argue it during closing arguments. There was no error.

Mendez next argues that his pretrial counsel was ineffective where, at a motion to suppress hearing, the attorney told the judge that he was unprepared to comment on the Commonwealth's motion for joinder. As the court gave counsel the opportunity to substantively oppose the motion at a later date both orally and in writing, the argument is without merit.

Mendez also contends that he was deprived of the right to an impartial jury where the Commonwealth improperly staged a vehicle for the jury to observe during a view of the crime scene. Upon objection, the judge struck that portion of the view, and told the jury to disregard it; Mendez does not argue that the jury were unable to do so. See Andrade, 468 Mass. at 549.

Finally, Mendez claims that it was error for the trial judge to refuse to remove a juror who asked a question during the view that he contends demonstrated a "pro-government mindset."[14] The judge denied the request, concluding that the juror's question did not "reasonably suggest[] prejudice." The judge's decision is entitled to deference where he had "the advantage of face to face evaluation." See Commonwealth v. Peppicelli, 70 Mass. App. Ct. 87, 94 (2007) (decision whether to

---

[14] After counsel pointed out security cameras at the housing complex, a juror asked counsel if they had been working on the day in question.

dismiss juror reviewed for abuse of discretion or other error of law).  There was no abuse of discretion.

Massie's three Moffett claims concern the jury instructions.  He first argues that the immunized witness instruction regarding Moitoso was reversible error, as it improperly bolstered his credibility.  The instruction accurately described how Moitoso obtained immunity, and it was preceded by an instruction that the jury may consider any promises, rewards, or inducements made when assessing witness credibility.  See Commonwealth v. Dyous, 436 Mass. 719, 727 (2002) ("[W]e do not require that a judge give cautionary instructions specifically mentioning a particular immunized witness. . . . Rather we consider whether the charge, as a whole, adequately covers the issue" [quotation and citations omitted).

Second, Massie contends that the judge failed to instruct the jury that the Commonwealth had the burden of proving its case against him on a theory of felony-murder beyond a reasonable doubt.  In fact, the judge properly instructed the jury, first describing the Commonwealth's burden of proof and later describing what the Commonwealth had to prove.

Finally, Massie argues that, regarding the lesser included offense of felony-murder in the second degree, the judge should have instructed the jury that if they found the elements were

satisfied, they were required to find him guilty of the lesser included offense. This is an inaccurate statement of the law, as jurors have a duty to return a guilty verdict of the highest crime proved beyond a reasonable doubt, here felony-murder in the first degree. Commonwealth v. Kirwan, 448 Mass. 304, 319 (2007). There was no error.

f. Review pursuant to G. L. c. 278, § 33E. We have reviewed the entire record and find no reason to exercise our extraordinary power to reduce the verdict for either defendant or grant a new trial.

Judgments affirmed.